David E. Bower (SBN 119546)
**MONTEVERDE & ASSOCIATES PC**
600 Corporate Pointe, Suite 1170
Culver City, CA 90230
Tel: (213) 446-6652
Fax: (212) 202-7880

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| FRANK KNIERIEM,<br><br>             Plaintiff,<br><br>  -against-<br><br>CATALYST BIOSCIENCES, INC., NASSIM USMAN, AUGUSTINE LAWLOR, YING LUO, THOMAS EASTLING, and ANDREA HUNT,<br><br>             Defendants. | Case No.<br><br>**COMPLAINT FOR VIOLATIONS OF SECTIONS 14(A) AND 20(A) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Frank Knieriem ("Plaintiff"), by and through his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is an action brought by Plaintiff against Catalyst Biosciences, Inc. ("Catalyst Biosciences" or the "Company"), and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Catalyst Biosciences, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9). Plaintiff's claims arise in connection with the proposed merger between

Catalyst Biosciences, GNI Group Ltd. ("GNI Group")[1], and GNI Group's affiliates, through a two-step transaction (defined in greater detail below as the "Transactions").

2.      Pursuant to the Asset Purchase Agreement dated December 26, 2022, and amended on March 29, 2023 (the "F351 Agreement"), Catalyst Biosciences acquired from GNI Group and GNI Hong Kong Limited ("GNI Hong Kong" and, together with GNI Group, the "Sellers") the F351 Assets[2].

3.      Under the terms of the F351 Agreement, the Company issued to the Sellers equity interests with an aggregate value of $35 million in the form of: (i) 6,266,521 shares of Catalyst Biosciences common stock; and (ii) 12,340 shares of Catalyst Biosciences Series X Convertible Preferred Stock, convertible upon the approval of the stockholders of the Company into shares of Catalyst Biosciences common stock at a ratio of one share of Catalyst Biosciences Convertible Preferred Stock to 10,000 shares of Catalyst Biosciences common stock.

4.      In addition, the Company, GNI USA, Inc. ("GNI USA"), the Sellers, Shanghai Genomics, Inc. ("SG," and collectively with GNI USA and the Sellers, the "Contributors"), the individuals (the "Minority Holders"), and Continent Pharmaceuticals Inc. ("CPI") entered into the Business Combination Agreement (simultaneously with the signing of the F351 Agreement), on December 26, 2022, as amended on March 29, 2023 (the "Business Combination Agreement"). Pursuant to the Business Combination Agreement, the Company will acquire an indirect controlling interest in Beijing Continent Pharmaceuticals Co., Ltd ("BC").

5.      Furthermore, pursuant to the Business Combination Agreement: (a) GNI USA will contribute all of its ordinary shares in the capital of CPI to Catalyst Biosciences in exchange for 688,850,101 shares of Catalyst Biosciences common stock (the "CPI Contribution"), (b) GNI USA

---

[1] As of March 1, 2023, the entities affiliated with the GNI Group own 16.6% of the outstanding shares of Catalyst Biosciences.

[2] The F351 Assets are the assets and intellectual property rights primarily related to the Sellers' proprietary Hydronidone compound, other than related assets and intellectual property rights located in the People's Republic of China ("PRC"). The F351 Assets include 15 issued or pending patents and patent applications outside of the PRC, with the last acquired issued patent expected to expire in August 2037.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

will contribute its interest in Further Challenger International Limited to Catalyst Biosciences in exchange for 264,971,695 shares of Catalyst Biosciences common stock (the "FC Contribution"), and (c) each Minority Holder will contribute 100% of the interest he/she holds in his/her respective Entity (as defined in the Business Combination Agreement) to Catalyst Biosciences in exchange for an aggregate of 156,954,428 shares of Catalyst Biosciences common stock to be issued to such Minority Holders (the "Minority Holder Contributions," and together with the CPI Contribution and the FC Contribution, the "Contributions," and collectively with the F351 Agreement, the "**Transactions**").

6.      On March 30, 2023, in order to convince Catalyst Biosciences' shareholders to vote in favor of the Transactions, Defendants filed the materially incomplete and misleading Preliminary Proxy Statement ("Proxy")[3] with the U.S. Securities and Exchange Commission ("SEC") in violation of Sections 14(a) and 20(a) of the Exchange Act.  In particular, the Proxy **entirely omits**: (i) the financial projections of BC and the Purchased Assets (defined in the F351 Agreement) made available to the Company's financial advisor, Raymond James & Associates, Inc. ("Raymond James") by Catalyst Biosciences, including, but not limited to, the financial projections prepared by Catalyst Biosciences management for the period ending 2023 through 2031, as approved for Raymond James' use by Catalyst Biosciences as of December 19, 2022; (ii) a summary of the financial analyses performed by Raymond James in connection with rendering a fairness opinion for the Transactions; (iii) the fee that Raymond James received from the Company for rendering a fairness opinion; (iv) the nature of the services that Raymond James rendered to Catalyst Biosciences in the two years preceding the date of Raymond James' fairness opinion and the fees that Raymond James received for those services; (v) whether Raymond James rendered services to the GNI Group (or its affiliates) in the two years prior to the date of Raymond James' fairness opinion; (vi) whether the confidentiality agreements that the Company executed with the 15 counterparties contained standstill provisions; and (vii) the names of the directors that

---

[3] The Proxy is available at:
https://www.sec.gov/Archives/edgar/data/1124105/000114036123014858/ny20006478x1_prem14a.htm

COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

were part of the Transaction Committee formed by the Board to oversee the strategic review process.

7.     The special meeting of the Company's shareholders to vote on the Transactions is forthcoming. Therefore, it is imperative that the material information identified above that has been omitted from the Proxy is disclosed to Catalyst Biosciences shareholders prior to the shareholder vote on the Transactions, so Plaintiff and the other shareholders can cast an informed vote.

8.     For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Transactions until the material information discussed herein is disclosed to the Company's shareholders sufficiently in advance of the shareholder vote or, in the event the Transactions are consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

9.     This Court has original jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction), as Plaintiff is alleging violations of Sections 14(a) and 20(a) of the Exchange Act.

10.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, the Company maintains its principal executive offices in this District at 611 Gateway Blvd., South San Francisco, CA 94080.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

**PARTIES**

12.     Plaintiff Frank Knieriem (defined above as "Plaintiff") was, at all times relevant times, a shareholder of Catalyst Biosciences.

13.     Defendant Catalyst Biosciences, Inc. (defined above as "Catalyst Biosciences" or the "Company") is a public company incorporated under the laws of Delaware with principal executive offices located at 611 Gateway Blvd., South San Francisco, CA 94080. The Company's common stock trades on the Nasdaq under the ticker symbol "CBIO." Catalyst Biosciences focuses on development and commercialization of liver fibrosis associated with a broad spectrum of chronic liver diseases in the United States and internationally. The Company develops Hydronidone that has completed phase 1 clinical trial for the treatment of nonalcoholic steatohepatitis, a severe form of nonalcoholic fatty liver disease.

14.     Individual Defendant Nassim Usman, Ph.D. is, and has been at all relevant times, the Company's Chief Executive Officer, President, and director.

15.     Individual Defendant Augustine Lawlor is, and has been at all relevant times, Chairman of the Board.

16.     Individual Defendant Ying Luo, Ph.D. is, and has been at all relevant times, a director of the Company.

17.     Individual Defendant Thomas Eastling is, and has been at all relevant times, a director of the Company.

18.     Individual Defendant Andrea Hunt is, and has been at all relevant times, a director of the Company.

19.     The Individual Defendants referred to in ¶¶ 14-18 are collectively referred to herein as the "Individual Defendants" or the "Board", and together with Catalyst Biosciences, the "Defendants."

**SUBSTANTIVE ALLEGATIONS**

**I.      Background of the Transactions**

20.     On December 27, 2022, the day after execution of the F351 Agreement and the Business Combination Agreement, GNI Group and Catalyst Biosciences issued a joint press

release announcing the Transactions (relevant excerpts produced below):

**Catalyst Biosciences Completes First Steps in Reverse Merger Plan**

*Acquires F351, a Phase 3 Drug to Treat Fibrosis*

*Will Acquire Controlling Interest in Continent, a China-Based Commercial Pharma Company,*

*from the GNI Group in Subsequent Transaction*

*Announces $7.5 million Special Dividend and Contingent Value Right (CVR)*

*CBIO Stockholder Meeting Planned for 2023*

*CBIO to Host Conference Call Today at 8:00 a.m. E.T.*

**South San Francisco, California and Tokyo, Japan, December 27, 2022** (GLOBE NEWSWIRE) -- Catalyst Biosciences, Inc. (NASDAQ: CBIO) ("Catalyst") and GNI Group Ltd. (2160.T) ("GNI") today announced that the parties have signed definitive agreements for the sale and purchase of GNI's proprietary new chemical entity F351 program. F351 has shown clinical efficacy as a treatment for both liver and kidney fibrosis. In a separate independent transaction, GNI and other minority stockholders will, subject to stockholder approval and certain customary closing conditions, exchange their controlling interest in Beijing Continent ("Continent"), a commercial-stage pharmaceutical company based in China and majority-owned subsidiary of GNI, for newly issued shares of Catalyst. Catalyst will continue to trade on NASDAQ under the ticker symbol "CBIO" after both transactions.

Continent is the first marketer of pirfenidone in China for idiopathic pulmonary fibrosis, which was approved in China in 2011. Continent recorded sales of 513 million RMB ($73 million USD) in the nine months ended September 30, 2022. Continent has operated profitability during the last 5 years while funding a clinical pipeline focused on other fibrosis indications, including F351 for hepatitis B virus (HBV)-associated fibrosis and non-alcoholic steatohepatitis ("NASH").

In conjunction with these transactions, CBIO will distribute $7.5 million on January 12th as a special dividend and grant a non-transferable (CVR), each to stockholders of record on January 5th. The CVR entitles stockholders of record to future dividends associated with the monetization of Catalyst intellectual property and other assets, including additional potential cash distributions. Catalyst expects the ex-dividend date for its common stock to be January 13th. This distribution follows a previous distribution of $45 million in September 2022.  The Company expects to make one or more additional distributions through the CVR in 2023.

The acquisition of F351, consummated concurrently with the execution of the definitive asset purchase agreement, provides Catalyst with the global rights to F351 (excluding Mainland China, where the rights are held by Continent) in consideration for 6,266,521 shares of common stock and 12,340 shares of a new series of preferred stock (Series X) with economic rights equivalent to Catalyst's common stock. Each share of Series X preferred stock is convertible into 10,000 shares of common stock, subject to stockholder approval under Nasdaq rules and subject to a beneficial ownership conversion blocker.

Both the conversion of the Series X preferred stock and the acquisition of a 65.18% interest in Continent will be subject to Catalyst stockholder approval, which will be sought in 2023. If the acquisition is approved by stockholders, Catalyst would issue at closing a total of up to 1,110,776,224 shares of common stock for a controlling interest in Continent, at which point Catalyst would expect to consolidate results of operations with Continent.

"The asset purchase of F351 and the subsequent business combination with Continent allows CBIO to both accelerate the return of cash to stockholders and provide additional value to our stockholders through equity ownership of Continent and a CVR for the monetization of our legacy assets," said Nassim Usman, Ph.D., chief executive officer (CEO) of Catalyst Biosciences.  "The company is continuing its efforts to monetize the legacy assets and we expect to distribute additional cash in 2023.  We believe that this set of transactions creates an attractive fibrosis company with further upside for our stockholders. Continent is profitable with a robust fibrosis pipeline in various stages of development, including a Phase 3 study of F351 in HBV associated fibrosis and a Phase 2 study poised to initiate in NASH fibrosis."

Ying Luo, Ph.D., CEO of GNI Group added, "Continent has funded its drug discovery programs in China using its own profits.  We are very excited with the positive results from the F351 Phase 2 clinical study of HBV-associated liver fibrosis in China and are keenly interested in expanding the clinical development of F351 for NASH fibrosis in the U.S. This transaction enables GNI Group to accelerate the clinical development of F351."

(Emphasis added).

## II.     The Proxy Omits Certain Material Information

21.     Defendants filed the materially incomplete and misleading Proxy with the SEC, despite the Individual Defendants being obligated to carefully review the Proxy before it was filed and disseminated to the Company's shareholders, to ensure it did not contain any material misrepresentations or omissions. Therefore, the Proxy must be amended prior to the shareholder vote on the Transactions, so Plaintiff and the Company's other shareholders can cast an informed vote.

22.     First, the Proxy provides that in performing the financial analyses in connection with its fairness opinion for the Transactions, Raymond James reviewed and relied upon the financial projections "of BC and the Purchased Assets (as defined in the F351 Agreement) made available to Raymond James by Catalyst [Biosciences], including, but not limited to, financial projections prepared by the management of Catalyst [Biosciences] for the period ending 2023 through 2031, as approved for Raymond James' use by Catalyst [Biosciences] as of December 19, 2022" (together, the "Projections"). Proxy, 119-20. However, the Proxy entirely omits the

Projections, which were key inputs utilized by Raymond James in performing the financial analyses in connection with the Transactions. *Id.* Absent disclosure of the Projections, the Company's shareholders cannot properly evaluate the financial fairness of the Transactions to them.

23.     Second, the Proxy does not disclose the summary of the financial analyses performed by Raymond James in connection with rendering its fairness opinion for the Transactions. The Proxy states that on November 9, 2022, the Company engaged Raymond James to perform an analysis of the fairness of the Transactions to Catalyst Biosciences. *Id.* at 115. Then, on December 20, 2022, Raymond James rendered to the Board its fairness opinion that indicated that the Transactions were fair to the Company's shareholders. *Id.* at 115, 119. Thereafter, the Board relied upon Raymond James' fairness opinion based upon the results of the financial analyses in approving the Transactions. *Id.*

24.     Indeed, the Proxy even specifically discloses that Raymond James "performed a discounted cash flow analysis with respect to BC and the Purchased Assets based upon the Projections", *id.* at 120, yet a summary of this analysis and the other financial analyses conducted by Raymond James relating to the Transactions are nowhere to be found.  Thus, the material omission of the summary of the financial analyses performed by Raymond James in connection with the Transactions is a direct violation of the following two SEC regulations: Item 1015 (17 CFR § 229.1015) and Item 14(b)(6) (17 CFR § 240.14a-101).

25.     Furthermore, the financial analyses performed by Raymond James evaluated the fairness of the Transactions to Catalyst Biosciences' shareholders, which is crucial information for them to be informed of when casting their vote on the Transactions. *In re Pure Res. S'Holders Litig.*, 808 A.2d 421, 449 (Del. Ch. 2002) ("[S]tockholders are entitled to a fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of their board as to how to vote on a merger . . . rely.").

26.     Third, the Proxy provides that Catalyst Biosciences paid Raymond James a "cash advisory fee" upon delivery of the fairness opinion, which was not contingent upon consummation of the Transactions. Proxy at 122. Yet, the Proxy omits the actual fee amount that the Company

8

paid Raymond James. This omission violates Item 1015(b)(4), because Item 1015(b)(4) requires disclosure of any compensation received as a result of the relationship between a financial advisor and the company it advises.

27.     <u>Fourth</u>, the Proxy states that in the two years preceding the date of Raymond James' fairness opinion in connection with the Transactions, "Raymond James has been engaged by or otherwise performed services for the Catalyst [Biosciences] for which it was paid a fee". Proxy at 122. However, the Proxy fails to disclose the nature of the services that Raymond James rendered to Catalyst Biosciences and the corresponding fees paid to Raymond James for those services. This omission also violates Item 1015(b)(4), because Item 1015(b)(4) requires disclosure of any material relationship that existed during the past two years between the subject company (*i.e.*, Catalyst Biosciences) and an outside party (*i.e.*, Raymond James) and any compensation received or to be received as a result of that relationship.

28.     <u>Fifth</u>, the Proxy omits whether Raymond James rendered services to the GNI Group (or its affiliates) in the two years prior to the date of Raymond James' fairness opinion, and if so, the nature of the services rendered and the corresponding compensation received.

29.     <u>Sixth</u>, the Proxy states that Catalyst Biosciences entered into confidentiality agreements with 15 counterparties in connection with the strategic alternatives process. Proxy at 114. Yet, the Proxy fails to disclose whether those confidentiality agreements contained standstill provisions, and if so, whether those standstill provisions contained "don't ask don't waive" ("DADW") provisions, including whether those provisions fell away upon execution of the F351 Agreement and the Business Combination Agreement or still remain in effect. Failure to disclose the existence of DADW provisions creates the false impression that an interested party who signed a confidentiality agreement could have made a superior proposal. **But that is not true.** If that confidentiality agreement contained a DADW provision, the interested potential acquirers could only make a superior proposal by breaching their respective agreement, because in order to make the superior proposal, they would have to ask for a waiver, either directly or indirectly. Therefore, omission of this information is misleading because potential topping bidders in the marketplace may be precluded from making a superior offer.

9

30.     <u>Seventh</u>, the Proxy does not disclose the names of the directors that the Board appointed to the Transaction Committee. Given that the Committee oversaw the strategic alternatives process, the Company's shareholders are entitled to this information so they can determine whether any conflicts of interest exist for the Committee members in connection with the Transactions.

31.     In sum, omission of the above-referenced material information renders the Proxy materially incomplete and misleading in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the shareholder vote on the Transactions, Plaintiff will be unable to cast an informed vote, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## CAUSES OF ACTION

## COUNT I

### (Against All Defendants for Violations of Section 14(a) of the Exchange Act)

32.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

33.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

34.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

35.     The omission of information from a proxy statement will violate Section 14(a) if other SEC regulations (like 17 CFR § 229.1015 and 17 CFR § 240.14a-101) specifically require disclosure of the omitted information.  Indeed, Item 1015 (17 CFR § 229.1015) and Item 14(b)(6) (17 CFR § 240.14a-101) require disclosure of the financial advisor's financial analyses, as well as information concerning the financial advisor's relationship with the company it advises. Therefore, omission of this information violates Section 14(a).

36.     Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Transactions.  Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide material information regarding: (i) the Projections; (ii) a summary of the financial analyses performed by Raymond James in connection with rendering a fairness opinion for the Transactions; (iii) the fee that Raymond James received from the Company for rendering a fairness opinion; (iv) the nature of the services that Raymond James rendered to Catalyst Biosciences in the two years preceding the date of Raymond James' fairness opinion and the fees that Raymond James received for those services; (v) whether Raymond James rendered services to the GNI Group (or its affiliates) in the two years prior to the date of Raymond James' fairness opinion; (vi) whether the confidentiality agreements that the Company executed with the 15 counterparties contained standstill provisions; and (vii) the names of the directors that were part of the Transaction Committee.

37.     In so doing, Defendants made misleading statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

38.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted

information identified above in connection with their decision to approve and recommend the Transactions; indeed, the Proxy states that Raymond James reviewed and discussed its financial analyses with the Individual Defendants, and further states that the Individual Defendants considered the financial analyses provided to them.  Further, the Individual Defendants were privy to and had knowledge of the Projections and the details surrounding the process leading up to the signing of the F351 Agreement and the Business Combination Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

39.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the F351 Agreement and the Business Combination Agreement.

40.     Catalyst Biosciences is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

41.     The misrepresentations and omissions in the Proxy are material and will deprive Plaintiff of his right to cast an informed vote on the Transactions if not corrected prior to the upcoming shareholder vote.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

**COUNT II**

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

42.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

43.    The Individual Defendants acted as controlling persons of Catalyst Biosciences within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or knowledge of the misleadingly incomplete statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the material statements that Plaintiff contends are incomplete and misleading.

44.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

45.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Transactions.  They were thus directly involved in preparing this document.

46.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the F351 Agreement and the Business Combination Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

47.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

13

COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

48.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' conduct, Plaintiff will be irreparably harmed.

49.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote or consummating the Transactions, until the Company discloses the material information discussed above which has been omitted from the Proxy;

B.     Directing Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED: April 21, 2023                                    Respectfully Submitted,

**OF COUNSEL**                                           **MONTEVERDE & ASSOCIATES PC**

**MONTEVERDE & ASSOCIATES PC**                           */s/ David E. Bower*
Juan E. Monteverde                                       David E. Bower SBN 119546
Rossella Scarpa                                          600 Corporate Pointe, Suite 1170
The Empire State Building                                Culver City, CA 90230
350 Fifth Avenue, Suite 4405                             Tel: (213) 446-6652
New York, NY 10118                                       Fax: (212) 202-7880
Tel: (212) 971-1341                                      Email:  dbower@monteverdelaw.com
Fax: (212) 202-7880

14

COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

Email: jmonteverde@monteverdelaw.com      *Counsel for Plaintiff*
     rscarpa@monteverdelaw.com

15